UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :  No. 3:12CR234(JAM)
                                :
          v.                    :
                                :
STEFAN ALEXANDRU BARABAS,       :
                                :  New Haven, Connecticut
                  Defendant     :  December 6, 2024
                                :
- - - - - - - - - - - - - - - - x
```

SENTENCING

BEFORE:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

APPEARANCES:

FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
157 Church Street, 25th Floor
New Haven, Connecticut 06510
BY:  DAVID E. NOVICK, AUSA

FOR THE DEFENDANT:

FROST BUSSERT LLC
350 Orange Street, Suite 100
New Haven, Connecticut 06511
BY:  TODD ALLEN BUSSERT, ESQ.

Diana Huntington, RDR, CRR
Official Court Reporter

1                          **10:00 A.M.**

2              THE COURT:  We're here today for a sentencing in

3    the matter of United States of America v. Stefan Barabas.

4              May I have appearance of counsel, please, for

5    the government.

6              MR. NOVICK:  For the government, David Novick.

7    Also present at counsel table is Shane Young, Special

8    Agent with the FBI.  Good morning, Your Honor.

9              THE COURT:  Good morning.

10             MR. BUSSERT:  Good morning, Your Honor.  Todd

11   Bussert on behalf of Mr. Barabas who is seated to my left.

12             I would just note that his mother is present in

13   the courtroom and, thanks to the Court's assistance, his

14   wife is appearing via Zoom.

15             THE COURT:  Mr. Barabas, are you doing okay

16   today, sir?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  Great.

19             I see that his wife is present on Zoom as well.

20             Is Mr. Lethbridge here, by chance?

21             MR. NOVICK:  He is, Your Honor.  He's seated

22   with Mr. Glasser in the audience.

23             THE COURT:  Welcome to all of you.

24             We're joined as well by our Probation Officer,

25   Mr. Christopher Baker.

1          Back on I believe June 18 of this year,

2    Mr. Barabas appeared before the Court for purposes of

3    entering a plea of guilty to Count Two of the indictment

4    that charges a federal extortion conspiracy and

5    interference of interstate commerce.

6          Mr. Barabas, I want to just cover with you today

7    what I'm going to go over during today's hearing.

8          The first thing I'm going to do is go through

9    some fairly technical matters, mostly with the attorneys.

10          After that, however, you will have an

11   opportunity, through counsel, first to make any kind of

12   presentation that you'd like to make.  You also have an

13   opportunity to address the Court if you'd like to.

14          Following that, I'll hear from the government.

15   And also, if Mr. Lethbridge wishes to address the Court --

16   he certainly doesn't have to -- if he wishes for any

17   reason to address the Court, he'd be very welcome to make

18   any kind of statement.

19          And then following the government's

20   presentation, I'll hear from Mr. Bussert if you have

21   anything before I turn to the imposition of sentencing.

22          Is that clear to you, Mr. Barabas?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  There was a Presentence Report and

25   an addendum to the Presentence Report prepared in the

1    case.  I wanted to make sure, have you read those, sir?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Have you discussed them with

4    counsel?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Okay.  And I know the Presentence

7    Report has a large number of facts in it.  It didn't look

8    to me that there were any factual disputes.  Do the

9    parties have any fact disputes with the Presentence

10   Report?

11             MR. NOVICK:  No, Your Honor.

12             MR. BUSSERT:  Nothing from the defense,

13   Your Honor.

14             THE COURT:  And Officer Baker as well calculated

15   a final offense level under the Sentencing Guidelines --

16   and again, this goes to technical matters, because I know

17   the parties have agreed to a different sentencing range

18   that's binding on the Court in this case for purposes of

19   today's hearing.  But for record purposes, I believe I'm

20   required to set forth that Officer Baker has calculated a

21   final offense level of 32, a Criminal History Category

22   of I, which would correspond to a recommend term of

23   imprisonment of between 121 to 151 months; a one- to

24   three-year term of supervised release; a $35,000 to

25   $250,000 fine; and a $100 special assessment.

1              Does that sound like a correct calculation of

2    the Sentencing Guidelines?

3              MR. NOVICK:  Yes, Your Honor.

4              MR. BUSSERT:  Yes, Your Honor.

5              I just note, for the record, that Mr. Barabas

6    paid the special assessment on the day of the plea.

7              THE COURT:  Thank you for that.

8              And so I'll adopt the Presentence Report's

9    factual statements and the Sentencing Guidelines

10   calculations.

11             And I know that Officer Baker has recommended,

12   with respect to a term of supervised release, that it

13   simply include one condition that's I believe spelled out

14   in the Presentence Report, paragraph 150, which is that

15   Mr. Barabas, if you are deported from the country, you may

16   not reenter the United States without permission of the

17   United States government to do so.  And you would have to

18   report -- if you did for any reason enter the

19   United States, you would have to report to the nearest

20   probation office within 72 hours.  That's the one

21   condition recommended for supervised release.  Everybody

22   agree on that?

23             MR. NOVICK:  Yes, Your Honor.

24             MR. BUSSERT:  Yes, Your Honor.

25             THE COURT:  All right.

1          I think that's it in terms of technical matters

2    that the Court wished to review.

3          Mr. Bussert, would you like to proceed?

4          MR. BUSSERT:  If I could, Your Honor.  May I

5    approach?

6          THE COURT:  Of course.

7          MR. BUSSERT:  Thank you.

8          Your Honor, I'll be brief.  I think it's pretty

9    clear, given the procedural posture of the case, that

10   really what we're talking about here is one year, the

11   difference between the low end and the high end of the

12   stipulated range.

13         I guess, preliminarily, one observation I would

14   make relative to the government's sentencing submission is

15   that the six years that Mr. Barabas seeks is done in part

16   with the government's permission, which is to say the

17   agreement provides for that.  And Mr. Barabas obviously

18   cannot control the terms of the agreement, and that was a

19   negotiated consideration.  My understanding is that the

20   victim was consulted relative to that before it was

21   offered and extended formally to Mr. Barabas.

22         Turning to the case itself, I don't think there

23   is any dispute by anyone here that the events that

24   occurred here are serious and were traumatic for those

25   involved, and no dispute that it probably has had a

1    carryover effect for not only Mr. Lethbridge but for his

2    family and Ms. Bass's surviving family, I assume in

3    particular for the mother of the child that was there in

4    the home that night.

5              THE COURT:  Exactly.

6              MR. BUSSERT:  That said, and again in no way to

7    minimize what occurred, I think it's also equally

8    undisputed the role that Mr. Barabas played as relative to

9    the other coconspirators.  And the government I think sets

10   that out in its memorandum as well in terms of Emanuel

11   Nicolescu and Alexandru Nicolescu being kind of the

12   primary drivers in the home and the issue of Michael

13   Kennedy and his role.  And there's some, I think, question

14   about that, but from our perspective he and Emanuel

15   Nicolescu were kind of the prime movers in terms of

16   actually concocting this scheme which, again, in terms of

17   a scheme seemed not to be well-conceived in the first

18   instance and not realistic in its intent.

19             But be that as it may, one of the things that

20   has always struck me about this case was my initial review

21   of the matter.  As the government indicates, Mr. Barabas

22   was arrested in August of 2022 in Hungary.  I was

23   approached shortly thereafter as representing him and

24   actually went to see him in Hungary around this time of

25   year two years ago.  And in the course of trying to get up

1   to speed and understand what we were facing here, I was

2   able to access and review the trial transcripts from the

3   original Emanuel Nicolescu trial.

4          In doing that, obviously, kind of the finer

5   points of what transpired or brought home particularly by

6   the testimony of Ms. Bass and Mr. Lethbridge in terms of

7   detailing what they were subjected to, what also stood out

8   and I think ultimately is consistent with how we find

9   ourselves understanding the roles that were played here is

10  testimony offered by Mr. Lethbridge that indicates

11  Mr. Barabas's basic humanity in this ordeal.  Which is to

12  say there was a question posed to him -- and I'm not sure

13  if it was Attorney Novick or Attorney McConnell who was

14  questioning Mr. Lethbridge -- but the question was posed

15  to Mr. Lethbridge: (Reading)

16          Is there a point when you became thirsty during

17  this period of time?

18          Answer:  Yes.

19          Question:  Did you express that?

20          Answer:  Yes.  At some point I said, well, my

21  mouth became so dry and it was really kind of very

22  painful, and I was thinking how long I would last if they

23  don't give us any water.  And I said to the guy that

24  was behind me, "Can I have some drink?" or "Can I have

25  some water?"  And he says sort of quietly, "Not now.

1    Later." (End reading.)

2              And then turning a few minutes later in the line

3    of questioning, he said: (Reading)

4              I had the feeling that when I asked for water

5    and he waited to give it to me, when I was actually given

6    the water there was no one else in the room except Anne

7    and I and this man.  (End reading.)

8              And then he distinguishes this act from when

9    Ms. Bass asked for water, and he says: (Reading)

10             At some point Anne asked for water, and this

11   other voice said, "You want water?"  And Anne said, "Yes,

12   please."  And then I heard a faucet run.  And the next

13   thing was the sort of water was thrown in Anne's face so

14   violently that a lot of it bounced off and splashed a part

15   of me too.  It seemed bizarre.  It seemed a bad -- that

16   she hadn't said anything to provoke it.  There was no

17   explanation for that either.  It just sort of happened as

18   though out of thin air.  There was no explanation.

19             Question:  Did you get the sense that this was a

20   different captor than the one that had given you water?

21             Yes.

22             Question:  And why was that?

23             Answer:  Just because he was in a different

24   position.  I guess I'm telescoping things because over the

25   course of the night the person I think was my captor, by

1    and large, whenever there was any expression of

2    considerateness, if that's an appropriate word to use in a

3    circumstance such as this, I had the feeling that he would

4    always wait to manifest that until he was alone in the

5    room.  And this action, the voice seemed different. (End

6    reading.)

7            Referring to what happened to Ms. Bass.

8            Then later in his testimony, Mr. Lethbridge is

9    asked: (Reading)

10           Did you complain at some point about the ties

11   being too tight?

12           Yes.

13           Question:  And then what happened?

14           Answer:  I think, again, he might have said "Not

15   now, later" or something.  He said "Not now."  (End

16   reading.)

17           I'll skip down a little bit.

18           He says: (Reading)

19           Again, not right away but sometime subsequently

20   my zip tie was cut and another one was put on and I was

21   given the instructions "Do not move your hands too much

22   because every time you move them it will tighten the

23   band." (End reading.)

24           And I'm almost done here.  This is a little bit

25   later as well: (Reading)

1          Question:  Did you get the sense and, if so,

2    could you describe for the jury whether these discussions

3    were with the person that had given you water in that

4    regard or it was somebody different?

5          I got the sense it was somebody different.

6          Question:  Can you explain why you believe that?

7          Answer:  Just again, when you have some senses

8    deprived in that way, the other ones become more alert and

9    acute.  And I'm a kind of visual person so you're trying

10   to put everything together and construct an image of

11   what's happening.  By and large, when I do this under

12   different circumstances I come to rely on whatever

13   scenario I can construct out of these different senses,

14   but I couldn't say for sure.  In this instance, the one

15   who seemed to be left primarily behind in the room to make

16   sure Anne and I didn't do anything just seemed to play a

17   different role on a different level than the other two.

18   (End reading.)

19          And, again, I think fundamentally that's true.

20          And again, there is a reason that Mr. Barabas

21   was enlisted here.  I think there's no dispute there was a

22   fairly significant age gap, particularly in that time.  I

23   believe the other three were in their late twenties and

24   Mr. Barabas in his early twenties.  And again, his only

25   connection with any of these three was with Manny

1    Nicolescu in terms of their playing soccer together and

2    being approached.  Again, no dispute that he went along

3    with what I would assume at the time was kind of a

4    get-rich-quick scheme.  This idea that you're going to

5    walk into somebody's room, this whole crazy scenario and

6    somehow walk away with eight and a half million dollars in

7    cash, again, just baffling to me that anybody thought this

8    was a workable scheme, but Mr. Barabas obviously

9    participated.  But even in the moment of being in the home

10   showed, I think, a level of consideration, a level of

11   humanity that distinguishes him from the other defendants.

12           Now, the government speaks in its memorandum

13   about his acceptance of responsibility and calls that into

14   question.  I think we need to put that in context as well,

15   which is to say when he was first approached he wasn't

16   even a target, right?  And he didn't voluntarily submit to

17   a DNA sample.  That's his constitutional right.  The idea

18   that citizens should just kind of fall all over themselves

19   to do what law enforcement asks of them I just find

20   difficult in at very fundamental level.  He had no

21   obligation.  There was no warrant because there was no

22   probable cause.  And he said no.  And there's no claim

23   that he was disrespectful or anything else.  And obviously

24   he left.  And I think we can all see in retrospect that he

25   was scared.

1          He went to Romania.  Law enforcement found him

2     there.  They had a warrant.  He submitted to the sample.

3     Again, they hadn't indicted him at that point, right, but

4     he submitted.  And nothing came of that.  There was

5     nothing about his DNA that was linked to the scene or to

6     the offense.  And then they filed the sealed indictment,

7     unsealed it in 2018, and ultimately located him in Hungary

8     with his family in 2022.

9          He comes back.  He pleads guilty, right?  This

10    is not -- and I think the government might acknowledge

11    this, maybe not as much as I would like, but I think they

12    would concede on some level that this is not a

13    particularly strong case against Mr. Barabas in terms of

14    the evidence they had available to them and also given the

15    age of the case relative to the evidence they had when

16    they first tried Mr. Nicolescu.  But Mr. Barabas accepts

17    responsibility, fully and timely pled guilty relative to

18    the negotiations.  And not only that, but he then

19    participated in what I kind of characterize, and I think

20    correctly, as a sword of justice measure, that is

21    answering questions posed by we understand from

22    Mr. Lethbridge.

23         And to be clear -- and I think we note this in

24    our sentencing memorandum -- this isn't cooperation.  This

25    isn't kind of a proffer for purposes of any kind of

1    benefit in that regard.  The case is over.  But he

2    understood and has always understood the import of his

3    actions here, and understood why Mr. Lethbridge would have

4    questions.

5           And, you know, I think we also, as parties to

6    the system, understand the unusual nature of the plea

7    agreement and how that can be perceived in terms of once

8    he goes into the BOP and other prisoners possibly seeing

9    him as a cooperator, like this idea that you're actually

10   affirmatively saying in a plea agreement that you're going

11   to sit down with the government and answer questions.  But

12   he understood all that.  We didn't try to kind of go

13   through a lot of machinations relative to protecting that

14   or sealing it, or whatever.  It simply is what it is.

15   It's an unusual circumstance, but it was one that he was

16   more than agreeable to, and we participated in.

17           As the record also shows, he's participated in

18   the restorative justice program that Wyatt's initiated at

19   the institution, has been doing that several months.

20           THE COURT:  The B.O.S.S. program?

21           MR. BUSSERT:  The B.O.S.S. program, yes,

22   Your Honor.  The restorative justice program.

23           THE COURT:  I saw that.

24           MR. BUSSERT:  And so when we look at the four

25   individuals in this case, we have Emanuel Nicolescu who

1    went to trial and was sentenced to 20 years; we have Alex

2    Nicolescu who pled guilty and received 10 years; and then

3    we have Michael Kennedy who received four years.  This

4    also strikes me.

5         I'm not saying that I'm 100 percent certain on

6    this, this is my general understanding, but I think it's

7    important.  The government says in its memorandum

8    "Barabas's post-offense conduct compares poorly with that

9    of co-defendant Michael Kennedy.  Michael Kennedy,

10   although he avoided responsibility for several years after

11   the crime, voluntarily flew to the United States more than

12   a decade ago, not only to take responsibility ... [but to

13   provide meaningful assistance]."

14        I believe, and I've spoken to Emanuel

15   Nicolescu's counsel previously, that Michael Kennedy

16   didn't actually testify against Emanuel Nicolescu.  He

17   cooperated, he provided information, but at least I think

18   defense counsel's understanding at that time was that as

19   the trial was going on the government was looking to

20   bolster its case and reaching out, and Kennedy was

21   providing information through his counsel.  And in the

22   course of that developing evidence, which I think in the

23   course of defense's representation may have caused a riff

24   because there was kind of a sense of why is all this new

25   evidence coming forward, and there's no question I think

1   that the information that Kennedy provided was valuable

2   and no doubt helped secure Emanuel Nicolescu's conviction,

3   but Mr. Kennedy didn't fly to the United States and get up

4   before a jury and testify under oath as to these things,

5   as I understand it.  He simply was behind the scenes and

6   feeding the government information, again, valuable

7   information.  But, you know, relative to what we

8   traditionally conceive of as cooperation, it was not that.

9         And I think through the discovery materials as

10  well -- and the government references this -- when the

11  Nicolescus and Kennedy met in Romania, it was Kennedy who

12  was kind of saying keep Barabas out of it, we shouldn't

13  invite him, and then I think maybe independently

14  consulting at least at some point with the government

15  relative to positioning himself in the best possible

16  position.  Which, if you look at the totality of the case,

17  is not surprising.  Again, it's our understanding Kennedy

18  was a big driver of the plan.  When the plan went down, he

19  stayed out in the car and the other three went inside.  So

20  he always kept his distance.  Then when everything went

21  south, he's the one who provides the information, derives

22  the greatest benefit, and one goes to trial and the other

23  is ultimately convicted or pleads.

24         So all of this is to say what is an appropriate

25  disposition here.  And so obviously the plea agreement by

1    its terms kind of places Mr. Barabas between Kennedy and

2    Alex Nicolescu in terms of the sentence he's facing in

3    terms of seven years.

4            But I think what we see when we look at

5    Mr. Barabas's background is the actions that occurred that

6    night are consistent with the character of the man that

7    people describe in terms of who he was as a young boy.

8    And while the government points out correctly that

9    Mr. Barabas had and has a very loving family, there is a

10   certain lack of direct parental supervision simply by dent

11   of what his parents were doing to try to provide for him,

12   and largely him before his sister was born when he was

13   much older, which is to say when he was younger they were

14   going to school and working and his grandparents helped

15   raise him.  When they came to the United States, as his

16   mother I think has attested to both in her interview with

17   Probation and in her letter, she was working

18   extraordinarily long hours which she continues to do,

19   especially because her husband is now disabled and she has

20   to provide.  So I think the love and the care and the

21   concern were there for them.  Was there a direct level of

22   parental oversight day to day?  Maybe not at that level,

23   particularly when they moved to the United States and

24   didn't have the support of the family like they had in

25   Romania.  So when the government points out that one of

1    Mr. Barabas's friends references him at some point getting

2    in with other kids that maybe started to make him make bad

3    decisions such as this, it puts that in context.

4             It's significant that he has these long-standing

5    friends from both childhood and his time in the

6    United States who have known him and even to this day he's

7    still in touch with them.  These are lasting relationships

8    and they speak to his character.  And generally what you

9    see is somebody who is kind, who is considerate, who is a

10   very loving person, particularly for his wife and his son

11   and for the family there in Hungary, his wife's family,

12   and somebody who is supportive.  And the people attest to

13   that when he was younger.

14            So we respectfully submit that when we're

15   looking at what is necessary and appropriate here,

16   considering all of the factors, that all of the goals of

17   sentencing are met through a six-year sentence and the

18   additional year is not necessary.  Thank you.

19            THE COURT:  Thank you, Mr. Bussert.

20            MR. BUSSERT:  Mr. Barabas does have a statement,

21   Your Honor.

22            THE COURT:  Mr. Barabas, would you like to

23   address the Court?

24            THE DEFENDANT:  Your Honor, I would like to

25   apologize for my actions.

1            I have great remorse and shame for what happened

2    to Ms. Bass and Mr. Lethbridge on the night of April 15,

3    2007.  Ms. Bass and Mr. Lethbridge didn't deserve to

4    suffer and be hurt anywhere, especially in their own home.

5    I want to show my regret openly and honestly.  Home is a

6    sanctuary, the place where one feels safest.  I am truly

7    sorry that I took that away from them.

8            As a father now, the knowledge that Ms. Bass's

9    grandson was in the home only adds to my shame and guilt.

10   I cannot describe the embarrassment that I feel for my

11   behavior.

12           I want to also apologize to the victims'

13   families because they suffer just as much.

14           I truly regret and I am ashamed of what I did.

15   And I am angry with myself and will forever be angry with

16   myself for doing it.

17           Thank you for listening.

18           THE COURT:  Thank you, Mr. Barabas.

19           MR. BUSSERT:  Thank you, Your Honor.

20           THE COURT:  Mr. Bussert, anything else?

21           MR. BUSSERT:  Not at this time, Your Honor.

22           THE COURT:  Government.

23           MR. NOVICK:  Thank you, Your Honor.

24           Your Honor, I do note, as Your Honor pointed

25   out, that Mr. Lethbridge is in the audience today.  Unless

1    he's changed his mind, he's not indicated an interest in

2    addressing the Court.  I think that over the 16 or so

3    years that I've known Mr. Lethbridge, I feel comfortable

4    in representing to the Court both through my sentencing

5    memorandum as well as here the impact that this offense

6    had on Mr. Lethbridge and Ms. Bass which I think was

7    profound and, not surprisingly, life-altering.  That's, in

8    part, why I think, first and foremost, justification for a

9    sentence here has to be punishment, just punishment, for

10   what Mr. Barabas and his confederates did 17 years ago.

11          And I think that in thinking about -- and I will

12   agree with something Mr. Bussert said.  In thinking about

13   what is the right sentence here, obviously this is unique

14   in the sense that the Court is cabined between 72 and 84

15   months by agreement of the parties.  And I agree with

16   Mr. Bussert, the one of the principal -- I would say the

17   principal reason why the government was willing to agree

18   to this sentencing range is because of 17 years later the

19   strength of the case that the government has is not what

20   it would have been had Mr. Barabas been caught much

21   earlier on.  Part and parcel of that is Mr. Kennedy is no

22   longer available to testify.

23          THE COURT:  I guess part of the issue is the

24   delay in this case seems to be, in part, because

25   Mr. Barabas decided to leave the country.

```
 1              MR. NOVICK:  Yes, Your Honor.  That's exactly

 2    right.

 3              THE COURT:  I guess it's his right to do so, but

 4    it's still meant delay.

 5              MR. NOVICK:  Yes, Your Honor.

 6              THE COURT:  It meant more time for

 7    Mr. Lethbridge.  It means, in the interim, Ms. Bass

 8    passing.  And so I guess I look at the delay issue here as

 9    not so mitigating.

10              MR. NOVICK:  I one hundred percent agree with

11    that, Your Honor.  I think that it forces the government

12    into a difficult spot.  Do we try this case principally

13    with -- the witness would have to be, obviously, Alex

14    Nicolescu, who I would have to parole back into the

15    United States as a convicted felon which was a doable

16    thing but obviously, given -- putting Mr. Lethbridge --

17    the possibility of putting Mr. Lethbridge through another

18    trial, that complication as well as the fact that Ms. Bass

19    is no longer with us, this became I think the right result

20    for the government, for the parties, for the Court.  But

21    it doesn't change the fact that, all else being equal, the

22    guidelines are not so far off as far as what otherwise

23    would have been a just sentencing here.  And that's why I

24    think in sort of deciding between 72 and anywhere in

25    between up to 84 months, an 84-month sentence seems to be
```

1    entirely reasonable if not less than what ultimately he

2    may deserve if we were in a different spot and we hadn't

3    had to wait the number of years that we have.

4            Mr. Bussert talks about relative culpability,

5    which obviously in a four-person conspiracy is something

6    that is important to consider.  He talks in particular

7    about Mr. Kennedy.  I want to address briefly some of the

8    things said about Mr. Kennedy.

9            It is certainly true that -- well, first,

10    Mr. Kennedy, unlike this defendant, did not flee.  When we

11    reached out, when we went to New York to start the sort of

12    overt part of this investigation in 2010, he was already

13    gone.  He was in Romania, had some initial conversations

14    with law enforcement, did not take responsibility at that

15    time, had reached out to us later on.  We had sort of

16    pushed him to come back in time to testify at the trial.

17    He declined.  And then after the trial was over, then

18    indicated his willingness to come back, but not just to

19    come back but also to provide active cooperation against

20    Alex Nicolescu who at the time was in Romania with him and

21    he engaged in -- which was a unique experience for me --

22    consensually monitored phone calls in Romania with Alex

23    Nicolescu, and then came back and then provided

24    information that I would say led directly to the

25    indictment of this defendant and Alex Nicolescu.

1          So in thinking about what credit he got at the

2    time of his sentencing and why he ended up with the

3    48-month sentence that he did I think in part was because

4    he was not one of the individuals who went in the house

5    but in large part was because he received appropriate

6    credit for having directly led to the indictment of two

7    other individuals, one of whom stands before the Court

8    now.

9          So I think in assessing relative culpability, I

10   think the Court both has to consider that and also the

11   fact that he did voluntarily come back to the

12   United States.  He voluntarily came back at a time that

13   would have otherwise sort of ended the uncertainty that

14   the victims had to live with over the last 17 years.  So I

15   do think that distinguishes him in a meaningful way from

16   this defendant and in many ways justifies the sentence

17   that Judge Bryant gave Mr. Kennedy as opposed to the

18   sentences that we're considering now for this defendant.

19          And I do think, you know, in thinking about the

20   things that sort of animate the Court's decision here, the

21   seriousness of the offense, you have the flight and the

22   extended trauma for the victims.  And I know one passage

23   in the letter that Attorney Hernandez submitted on behalf

24   of the victims 12 years ago at the first sentencing -- and

25   that obviously is 12 years before where we sit now --

1   said, well, one of the perpetrators has now been arrested

2   and convicted.  The fact that this was a coordinated,

3   organized criminal operation and the other perpetrators

4   have not been arrested enhances their concern that there

5   are other individuals who may return or strike again

6   somewhere else.

7          And so even back then the victims were I think

8   in large part animated by this uncertainty, this worry

9   that there was more harm due them ultimately from the

10  people who were involved in this crime.  I don't think

11  they anticipated that they were going to have to wait

12  another 12 years to get to justice.

13         So I do think, as Your Honor has already

14  indicated, that the flight here and the continued flight

15  and the continued denial of responsibility is an important

16  factor here.

17         And I agree with Mr. Bussert that, look, when

18  they came to seek his DNA in 2010, he didn't have to give

19  it.

20         THE COURT:  Can I ask you something?  I don't

21  want to base a sentence on a defendant's denial --

22         MR. NOVICK:  Agree.

23         THE COURT:  -- of responsibility.  I think I was

24  pointing to something different.

25         MR. NOVICK:  Yes, Your Honor.

1          THE COURT:  Just the fact that there's been

2    delay in the case, ultimately.  Which is the concern, in

3    part, for me in the case.

4          MR. NOVICK:  Understood.

5          THE COURT:  One of the parts of the concern.

6          MR. NOVICK:  Understood, Your Honor.

7          For me, it's not even -- and I guess what I was

8    pointing out before is there are other folks here,

9    including Mr. Kennedy, who affirmative went and took

10   responsibility.  So, fine, understand not faulting the

11   defendant --

12         THE COURT:  I'm just being careful about that.

13   I don't want to rely on possibly an improper factor.

14         MR. NOVICK:  Understood, Your Honor.

15         But in thinking about the credit and the

16   sentence that Mr. Kennedy got as opposed to this

17   defendant, I think it is a meaningful distinction.

18         The last point, Your Honor, as I said in my

19   sentencing memo, I agree with counsel that the Court

20   should consider everything that the defendant has done

21   since that time, including his family circumstances, the

22   fact that he has not been engaged in further criminal

23   activity.  But I don't think that is to such a degree that

24   it minimizes or undermines the importance or the need for

25   a sentence that reflects just punishment here.  And I

 1    don't think -- I think it would be improper for the Court

 2    to credit that time given that all of that time in which

 3    he's been doing that he has been in flight from

 4    prosecution, essentially.

 5          And unless the Court has other questions, unless

 6    Mr. Lethbridge has anything more to add -- no, he doesn't.

 7          THE COURT:  I don't think so.  Thank you very

 8    much.

 9          Mr. Bussert, do you have anything you'd like to

10    say in response to the government?

11          MR. BUSSERT:  If I could, briefly.

12          THE COURT:  Of course.

13          And I also wanted to make clear if anybody would

14    like to speak on Mr. Barabas's behalf, they are very

15    welcome to do so.

16          MR. BUSSERT:  Thank you, Your Honor.

17          I just want to be clear.  When I referenced kind

18    of the strength of the government's case, and realizing I

19    think the passage of time and how that implicates things,

20    I think it's fair to say that the case against Emanuel

21    Nicolescu, that trial was somewhat circumstantial.  Again,

22    when you read the original trial transcript, it's really

23    an unusual case how all of this came to be, the

24    investigation and the discoveries.  And, again, law

25    enforcement I think deserves considerable credit for

1    doggedly pursuing its various leads.

2          But I think the issue -- and again, the timing

3    is obviously -- Mr. Barabas contributes to that in part

4    because of the circumstances.  But I was trying to I think

5    offer the context that when he came back here, if he

6    wasn't accepting of responsibility, this is a very triable

7    case.  To the extent it was a circumstantial case, you

8    know, when Mr. Nicolescu was tried, it's even more so with

9    respect to Mr. Barabas.  You know, to the extent that the

10   government had a strong case or strengths to its case,

11   those have considerably weakened over time.  So if you

12   want to stand up and say he doesn't accept responsibility,

13   I think he fully does.  He could have put the government

14   to its proof.  There's a reasonable chance that he could

15   have prevailed.  Again, nobody can predict what happens at

16   a trial.  To simply say this was the normal Title III

17   surveillance, controlled buys kind of drug case for the

18   government, they're slam dunks.  That's not this case.

19   And I think there was a recognition of that and a

20   recognition of what a trial would entail and why to accept

21   responsibility and not put Mr. Lethbridge or anyone else

22   through that process again, and I think his plea agreement

23   represents that.

24          When we talk about relative culpability, and

25   again looking at the numbers, and if we're really looking

1   at Alex Nicolescu and Mr. Kennedy, Alex Nicolescu was a

2   hired gun.  He flew in from England days before or shortly

3   before this, participated because he spoke with an English

4   access.  But he wasn't just the voice; he's the one who

5   did the injections.  And I would assume he's the one who

6   threw the water in Ms. Bass's face.  He seemed to have a

7   fairly I would say violent predisposition and was very

8   aggressive in posture in this case for somebody who was

9   just kind of flying in to supposedly speak in an accent so

10  he wouldn't be detected.  The 10 years he receives, which

11  was the bottom of his range, you know, I think recognizes

12  his distinct role in this case.

13          And again, just relative to the strength of the

14  government's case, the idea that Alex would come back and

15  testify at Mr. Barabas's trial, he also has a host of

16  mental health issues.  He's not a great witness for them

17  on some level, which they know.

18          And then we get to Kennedy.  I guess the thing

19  that's really striking to me -- and again I think we've

20  all been party to this process enough -- is how overtly

21  manipulative he was.  He's deceased.  And again, I think

22  it speaks to the government's need for him in order to

23  provide evidence.  Mr. Novick didn't get up and disagree

24  with anything I said in terms of them eliciting

25  information from him during the course of the Emanuel

Nicolescu trial.  So I'm assuming that actually did happen.  But what I find telling is, again, he seems to confirm that when Kennedy and the Nicolescus were meeting in Romania, somewhere contemporaneous to that he's calling the government, minimizing what he was doing or denying, but already in contact with the government then, right?  And then when the Emanuel Nicolescu trial happens, as Mr. Novick said, he declined to come back and testify.  Declined.  He's doing us a super acceptance, but at that moment he declined.  Again, what he's doing is working with the government on his terms, not on their terms, which is to say I'll provide you information but I'm not going to come back and actually testify.  You can use it if you want.  Then once they found Alex Nicolescu, they realize this case still isn't over, okay, I'll cooperate now and I'll provide more information or I guess he helps indict him.  Essentially, he realizes the case isn't over, they're still looking for him, and he continues to provide.  And finally he works out a great deal for him, right, and he gets his four years.  But you can see very clearly the level of control that he was exercising over the process.  In my experience, especially if he were here, the government wouldn't necessarily be that deferential to his demands or the conditions he was setting relative to his cooperation and participation.

1          And so the idea that it was Kennedy who was

2    really a driver behind this whole scheme I think is

3    actually borne out by how he interacted with the

4    government and kind of worked out the best arrangement for

5    him.  So, again, distanced himself.

6          So, again, in terms of relative culpability,

7    it's always been my perception that it's Kennedy, and then

8    Emanuel Nicolescu.  And I really had the sense it was

9    really Kennedy who kind of got this thing going.

10   Obviously, Emanuel Nicolescu had the information because

11   he worked for the family.  And so the two of them concoct

12   this thing and then enlist Alex Nicolescu, and then kind

13   of at the eleventh hour bring in Mr. Barabas.

14          So when we see that, again, I think the six

15   years, when we juxtapose that to Kennedy, I think it's

16   more than fair, respectfully.  Because it wasn't

17   Mr. Barabas who concocted this scheme.  It wasn't

18   Mr. Barabas who went out and bought all the items.  It

19   wasn't Mr. Barabas who disposed of the evidence after the

20   fact.  It wasn't Mr. Barabas who was injecting people and

21   threatening with poisoning.  It was Mr. Barabas who, in

22   the heat of the moment, was offering some measure of

23   comfort, what little that he could, and doing it a way

24   that the drivers, the main players in this thing, they

25   were out of the room and not witness to it.

```
1              THE COURT:  But he's there, right?

2              MR. BUSSERT:  I think everyone would be.

3              THE COURT:  He's there.  He agrees to be there.

4    He's part of the war cry when they burst into the place

5    late at night.  He watches these people.

6              You started off your comments today saying this

7    was, quote, traumatic and, quote, serious.  Those seem to

8    me to be a vast understatement of what this incident was

9    about.  This incident was basically an act of terrorism.

10   It was horrific what these men did inside that house.  To

11   Mr. Lethbridge, physical violence, they struck him --

12   somebody struck him.  Whether it was Mr. Barabas or not,

13   Mr. Barabas was all part of the group there.  Same with

14   Ms. Bass.  To say nothing of this forcible injection and

15   then the drinking of the liquid afterwards.  It's so hard

16   to imagine the fear, especially for Ms. Bass with her

17   grandchild in the house.

18             And so I guess, you know -- and I understand

19   your point, okay.  And I appreciate your reading the

20   transcript.  That was important for me to hear that.  But

21   I have to say he still decided to be there.  And he didn't

22   stop it.  And he was a part of it.  And it seems like this

23   incident would be just much more than traumatic to any

24   reasonable person like Mr. Lethbridge or Ms. Bass and

25   their family members.  I just want to let you know I have
```

1    concerns about the way it's being characterized.

2            MR. BUSSERT:  Your Honor, I think that's

3    completely fair.  To the extent I was seen as minimizing

4    it, that was not my intention.  But I think that context

5    that Your Honor offers actually helps inform Mr. Barabas's

6    actions and gives some understanding in terms of the

7    position in which he found himself.

8            Again, he's younger than the group.  He's at an

9    age where the science shows that his decision making is

10   not what it would have been, let's say, five years later.

11   He agrees to this.  Maybe because it sounds like, hey,

12   this seems like a pretty straightforward thing and I can

13   make a lot of money.  And then he finds himself in this

14   circumstance with these individuals engaging in the types

15   of actions that Your Honor says in terms of the injections

16   and everything else.  Again, that wasn't him.  And there's

17   no question about that.  And he can't readily extricate

18   himself from that.  I don't know that he could have

19   readily put a stop to it.  And again, he is not like down

20   the street in New York where he can walk out and catch a

21   cab.  It's in the middle of the country in Connecticut.

22   He's from the City in a place he doesn't know and

23   obviously driving up there and the description about what

24   happens with the cars and everything else, he's in the

25   middle of nowhere.

1          So he gets out and essentially Emanuel Nicolescu

2     does give him some money to get out of the country.  But

3     again, they don't meet with him in Romania, right?  He

4     essentially distances himself from that point forward.  He

5     goes about his life.  And again, I think that's where he

6     is the entire time.  He is an outsider brought into this.

7     He is not part of this core group of three.  And I think

8     that is significant.

9          So I think, you know, if it wasn't for that, if

10    it wasn't for the acts of humanity that he displayed, I

11    think there would be more to that.  What benefit was it to

12    him do give Mr. Lethbridge some water?  What benefit was

13    it to him to undue the ties?  Again, when all of this was

14    going on and the terror, as Your Honor I think properly

15    characterizes it, why is it that one of the individuals

16    being directly affected is saying this person is different

17    than the other two?  Even in that moment there's a

18    recognition that these other two have something going on,

19    this person is treating me differently and more humanely.

20    To the extent he had any agency there to be of assistance,

21    he did.  And I think that is significant, Your Honor,

22    respectfully.

23          THE COURT:  If the parties don't have anything

24    to add, I'm going to turn to the imposition of sentencing

25    at this time.

 1          Mr. Barabas, don't stand at this point.  I want
 2   to actually talk to you a bit about what I've considered.
 3          Whenever I impose a sentence, I have to think
 4   about a lot of different things, and they include of
 5   course what it is you did wrong, even if it was many years
 6   ago, that brings you into the courtroom.  But apart from
 7   that, I have to think about the rest of you as a person in
 8   terms of your life and your family, things that you've
 9   done right in your life.  And I've learned a lot about
10   that through Mr. Bussert's submissions in the case, very
11   good submissions, and also through the numerous letters
12   that I've received.
13          And then I have to think about all of that in
14   terms of what's an appropriate sentence.  And by law,
15   Congress tells me what I have to think about -- and we
16   talked about this before -- in terms of what's a just
17   punishment, what would deter and discourage, and
18   rehabilitation.  Those are the main things.  Promoting
19   respect for the law, what reflects the seriousness of the
20   offense.
21          I also think about the Sentencing Guidelines,
22   although they're less relevant in this case.  And I have
23   to think about the issue you've heard the attorneys
24   talking about a lot in terms of relative culpability.
25          Basically, my role is to try to decide upon a

1    sentence that's fair and just and reasonable and

2    certainly, as Mr. Bussert's just reminded me, not any

3    greater, not any greater than necessary to achieve those

4    purposes of sentencing.

5            So in your case, I have concerns kind of on both

6    sides.  What I'll call the not-so-good side, I have a

7    concern that you very much made a choice to travel quite a

8    ways up to the hinterland from where you were down in

9    New York City to join this scheme.  And it was a get-rich

10   scheme, as counsel says, but it was also a scheme that was

11   violent, ultimately was going to depend upon threats and

12   maybe the actual use of force.  And so, sadly, that's what

13   happened up there.  And you were part of that group.  And

14   you can't say I wasn't part of that group.  You were part

15   of the group that did that.  And it was, frankly, just

16   absolutely chilling and horrifying to read and to learn

17   about what happened.

18           I just can't imagine the devastation for you,

19   Mr. Lethbridge.  And frankly, the courage, sir, for you to

20   come back to court again when you're trying to put all

21   this behind you.  But to be back here in court, it means a

22   lot that you've come to court just to be here today for

23   purposes of this proceeding.

24           Now, Mr. Barabas, I think as well that it's not

25   helpful to you that you, through your actions, led to

1    considerable delay in the case.  Ultimately, of course,

2    you've come around.  I get that.  But at the end of the

3    day, unfortunately, I see a lot that is not so good here

4    in terms of the choice that you made.

5            On the flip side, there are plenty of things

6    that weigh in your favor, in my view.  You were young.

7    Younger than the others there.  You were, I suspect, more

8    susceptible to influence, less likely to check a horribly

9    wrong decision like this.  That weighs in your favor.  You

10   don't have prior criminal history.  You joined quite late

11   in the plan.  I don't know and have any information to

12   suggest that you were any kind of mastermind or deciding

13   on what was being done.  That doesn't excuse you because

14   you were standing there watching what your codefendants

15   were doing.  I think that -- and I've been very impressed

16   from what I've learned from your spouse, your mom, and so

17   many others, even your 102-year-old grandfather, the

18   general, about, you know, what you've done right in your

19   life, what your family has done right in your life, the

20   experiences that you've had growing up in a very different

21   culture, its own very challenging political environment

22   that I've learned about.  And the fact that I believe you

23   are regretful.  You've told Officer Baker that.  And

24   you've emphasized that again.  You said, and you were

25   surely right about this, it's the worst thing you've ever

1   done in your life.

2           So as I look at everything here, I'm convinced

3   that a sentence at the maximum that I'm allowed to impose

4   is the appropriate sentence.  And it's really for reasons

5   of just punishment, in my view.  I don't know that you're

6   a risk to be going back to doing this kind of thing again.

7   I think you're much more in mind of your family and your

8   young son, I know, you've been very supportive of.  I

9   don't know that there's particular rehabilitation that's

10  going to happen, especially if you're abroad.  I hope that

11  you'll take the time while you're in prison to continue to

12  improve yourself as a person.  But primarily it's really

13  for reasons of just punishment that I think a seven-year

14  sentence is really an appropriate sentence and considering

15  all the arguments I've heard from counsel with respect to

16  relative culpability.

17          So I'd ask you to stand at this time, sir, for

18  the imposition of sentence.

19          Mr. Stefan Barabas, for the reasons I've stated,

20  I'm imposing a sentence of seven years, or 84 months, of

21  imprisonment.  That will be followed by a term of

22  supervised release of three years with a single condition

23  that we explained from paragraph I believe 150 of the

24  Presentence Report not to reenter the country if you are

25  deported.  Now, if for some reason there's a delay and

1   you're in the country, I expect I would hear from the

2   parties with respect to possibly setting additional

3   conditions of supervised release, but that seems to me

4   much more likely that you're not going to be in the

5   country.

6           I'm not imposing a criminal fine at this time.

7           I know there's not been a request for

8   restitution.

9           I'll impose the $100 special assessment that I

10  understand has already been paid.

11          I'll make a recommendation to FCI Allenwood, I

12  think, Mr. Bussert, in the terms you proposed in the

13  sentencing memorandum.

14          MR. BUSSERT:  Yes, your Honor.

15          THE COURT:  And I'm not sure, are there other --

16  that's the Court's sentence.  I'll ask the parties, any

17  requests for correction, clarification if I've misstated

18  something?

19          MR. NOVICK:  None from the government other

20  than, Your Honor, I would ask the Court to dismiss

21  Counts One and Three.

22          THE COURT:  That's granted.

23          MR. NOVICK:  Thank you.

24          THE COURT:  Mr. Bussert, is there anything else?

25          MR. BUSSERT:  Your Honor, for the reasons we set

1   forth on page 17 of our memorandum, if in the judgment

2   statement of reasons section if the Court could note that

3   Mr. Barabas has been continuously detained since

4   August 16, 2022.

5           THE COURT:  Yes.  With expectation he will

6   receive credit.  I know it's not my job to credit.

7           MR. BUSSERT:  Just to flag it for the BOP so

8   there's no ambiguity.  I'm assuming he will get credit.

9           THE COURT:  That's fine.  We'll put that in.  If

10  there's an issue in terms of the wording on the judgment,

11  just let us know.

12          MR. BUSSERT:  Thank you, Your Honor.

13          THE COURT:  Anything else?

14          MR. NOVICK:  No, Your Honor.  Thank you.

15          MR. BUSSERT:  Nothing for defense.

16          THE COURT:  Thank you all.  Stand in recess.

17          Oh, sit down, please.  I'm being reminded I

18  forgot to go through appeal rights.

19          Mr. Barabas, you have the right to appeal the

20  conviction and/or sentence.  If you wish to do so, you

21  have to do it in the next 14 days.  And if you could not

22  afford counsel for an appeal, you would have counsel

23  appointed to represent you.  If you couldn't afford the

24  cost of appeal, you would have the cost paid for you.  Do

25  you understand that, sir?

1                    THE DEFENDANT:  I do.

2                    THE COURT:  Thank you, again.

3                         (Proceedings adjourned at 10:53 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          C E R T I F I C A T E

4

5    RE: UNITED STATES OF AMERICA v. STEFAN ALEXANDRU BARABAS
                    No. 3:12CR234(JAM)
6

7              I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1 through 40 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                          _____/s/_____

18                          DIANA HUNTINGTON, RDR, CRR
                               Official Court Reporter
19                          United States District Court
                            141 Church Street, Room 147
20                          New Haven, Connecticut 06510
                               (860) 463-3180
21

22

23

24

25